## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DARRYL JAMUAL WOODS,

                Petitioner,                 Case Number: 06-CV-11084

v.                                     HONORABLE GERALD E. ROSEN

RAYMOND BOOKER,

                Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Darryl Jamual Woods, through his attorney, has filed a petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner, who is currently incarcerated at the

Ryan Correctional Facility in Detroit, Michigan, challenges his convictions for first-degree

murder, assault with intent to murder, assault with intent to rob while armed, and felony firearm.

For the reasons set forth below, the Court denies the petition.

### I. Background

The Michigan Court of Appeals summarized the facts adduced at Petitioner's trial (which

was a joint trial with defendant Mario Henderson before separate juries) as follows:

> These consolidated cases involve the shooting death of Anthony Capers and the
> gunshot injuries of Cecil Brewington during an attempted drug-related robbery in
> the City of Detroit on January 25, 1990. According to trial testimony,
> Brewington went to Capers' house to lend him $3500 to purchase four one-half
> ounces of cocaine from defendant Woods. Brewington waited with Capers and a
> third man, Charles Kemp, for Woods to arrive with the cocaine.
>
> When Woods arrived at Capers' house, he was accompanied by defendant
> Henderson. In response to Capers' inquiries, Woods explained that he did not
> have the cocaine with him, but that two men waiting outside in the car had it.
> Capers and Brewington then became nervous, and Brewington suggested that

Capers "squash" the deal. At that point, Woods offered to get the cocaine himself from the men in the car.

While defendant Henderson remained in the house, Woods went to the car and returned with the two men. As soon [as] they were inside the house, one of the two men from the car pulled out a gun and announced a "stick-up." At that point, Kemp testified that defendant Henderson told him to "face down," and saw that Henderson was armed as were the other three.

When Capers, who was unarmed, began moving toward the back bedroom, he was chased and was shot six times by one of the two men from the car. After the gunfire from the back of the house was heard, the gunman covering Brewington demanded to know who had the money. Brewington said that he did, throwing the money on the dining room table. As the gunman bent down, Brewington ran to the front door. When Brewington refused to let go of the door, Woods shot him in the leg and again in the thigh. As Woods raised the gun to his head, Brewington grabbed Woods' hand and the gun fired a third time, missing Brewington. When the door would not open, defendants Woods and Henderson fled with the other two men through the front window, leaving the area in a blue car.

*People v. Woods*, No. 136731, slip op. at 1-2 (Mich. Ct. App. July 22, 1993).

## II. Procedural History

Following a jury trial in Wayne County Circuit Court, Petitioner was convicted of first-degree felony murder, first-degree premeditated murder, assault with intent to murder, assault with intent to rob while armed, and felony firearm. At the time of sentencing, Petitioner's conviction for first-degree premeditated murder was vacated, and he was sentenced to life imprisonment for the first-degree felony murder conviction, ten to thirty-five years for the assault with intent to commit murder conviction, eight to thirty-five years for the assault with intent to rob conviction, and two years imprisonment for the felony-firearm conviction.

Petitioner filed an appeal of right in the Michigan Court of Appeals, raising the following claims through counsel:

I.      Whether there was sufficient evidence presented at trial to support the conviction

of first-degree premeditated murder.

II.     Whether there was sufficient evidence presented at trial to support the conviction for first-degree felony murder.

III.     Whether there was sufficient evidence produced at trial to support the conviction for assault with intent to commit murder.

IV.     Whether there was sufficient evidence produced at trial to support the conviction for assault with intent to rob while armed.

V.     Whether the admission into evidence of a photograph of the deceased's body constituted reversible error as being prejudicial, inflammatory and nonessential to prove a matter in issue.

VI.     Whether the defendant was denied the effective assistance of counsel in violation of the Sixth Amendment right to counsel.

In a supplemental *pro se* brief Petitioner raised the following additional claims:

I.     Whether the defendant was denied his state and federal constitutional rights to due process and a fair trial by the prejudicial remarks made by the prosecutor in arguments to the jury.

II.     Whether the trial court's conduct in instructing the jury constituted reversible error.

III.     Whether the defendant was denied the effective assistance of counsel in violation of the Sixth Amendment right to counsel.

IV.     The questioning of a prosecution witness by the court enhanced the prosecution's case thereby causing reversible error.

Petitioner also filed a motion for remand to the trial court for a determination whether he was deprived of an impartial jury because two of the jurors were siblings.

The Michigan Court of Appeals affirmed Petitioner's convictions in all respects, but remanded the matter to the trial court for a hearing regarding whether Petitioner was entitled to a new trial on the ground that two jurors were related and concealed this information during *voir dire*. *People v. Woods*, No. 136731 (Mich. Ct. App. July 22, 1993).

On remand, the trial court held that two jurors failed to disclose their familial relationship, but that they were not specifically asked to do so, and Petitioner was not prejudiced by their conduct. The trial court, therefore, denied Petitioner's motion for a new trial. The Michigan Court of Appeals affirmed the decision of the trial court on remand. *People v. Woods*, No. 136731 (Mich. Ct. App. Aug. 17, 1994).

Petitioner filed an application for leave to appeal in the Michigan Supreme Court, raising the same claims raised before the Michigan Court of Appeals. The Michigan Supreme Court denied leave to appeal. *People v. Woods*, No. 101358 (Mich. May 30, 1995).

On April 23, 1997, Petitioner filed a motion for relief from judgment in the trial court, raising the following claims:

I.     Defendant Darryl Woods seeks a new trial and/or an evidentiary hearing based on newly discovered evidence provided by a witness unknown to the defense at the time of trial.

II.    A manifest injustice has occurred in this case where defendant Darryl Woods' convictions were obtained on false sworn testimony in violation of his right to due process of law. Newly discovered evidence establishes this claim and a new trial should be granted.

III.   The trial court committed reversible error where it refused to provide the jury with requested written instructions on the charged offenses and failed to orally re-instruct on the offenses.

IV.    The trial court's failure to properly instruct the jury denied appellant of his right to a fair trial as guaranteed by both the federal and state constitutions.

V.     Defendant Darryl Woods was denied his right to a fair trial and impartial jury where the trial court's conduct pierced the veil of impartiality in violation of the due process clause under the federal and state constitutions.

VI.    Defendant Darryl Woods was denied his constitutional right to effective assistance of counsel, therefore, he is entitled to a hearing pursuant to *People v. Ginther*, 390 Mich. 436 (1973) and or a new trial.

VII.     Defendant Darryl Woods was denied a fair trial by the prosecutor's misconduct in violation of the due process clause of both the federal and state constitutions.

VIII.    The trial court's failure to ascertain on the record whether the defendant Darryl Woods intelligently and knowingly waived his right to testify requires a new trial.

IX.      Defendant Darryl Woods is entitled to an evidentiary hearing on his claim of ineffective counsel resulting in an involuntary waiver of his right to testify pursuant to *Gonzalez v. Elo*, 972 F. Supp. 417 (E.D. Mich. 1997).

X.       Defendant Woods was denied his right to a fair trial by the cumulative errors made during his trial.

The trial court conducted an evidentiary hearing regarding Petitioner's claim of newly discovered evidence, during which two witnesses, Charles Kemp and Willie Thomas testified. The trial court granted the motion for relief from judgment on the ground that substantial doubt existed as to whether Kemp was truthful in his trial testimony and that the perjured testimony clearly prejudiced Petitioner.

The Michigan Court of Appeals granted leave to appeal to the prosecutor. The court of appeals held that the new evidence related to a collateral matter and would not have impacted the outcome of the trial. The court of appeals, therefore, reversed the trial court decision. *People v. Woods*, No. 249036 (Mich. Ct. App. Nov. 16, 2004). The Michigan Court of Appeals denied a motion for reconsideration. *People v. Woods*, No. 249036 (Mich. Ct. App. Jan. 3, 2005).

Petitioner filed an application for leave to appeal in the Michigan Supreme Court. The Michigan Supreme Court denied leave to appeal. *People v. Woods*, No. 128101 (Mich. Dec. 15, 2005) (Cavanagh, J. dissenting).

Petitioner then filed the pending petition for a writ of habeas corpus, raising the following claims:

I.       Petitioner was denied due process of law when the state used perjured testimony

at trial that led to petitioner's conviction and a newly discovered witness provided evidence establishing prejudice to petitioner's right to a fair trial.

II.     Petitioner Woods was denied due process of law because there was insufficient evidence to sustain the verdicts.

III.    Petitioner Woods was deprived of his right to effective assistance of counsel when his attorney, (a) failed to properly investigate and present the defense, (b) failed to object to the prosecutor's improper statements and, (c) failed to object to inadmissible hearsay that prejudiced petitioner's right to a fair trial.

IV.     Petitioner Woods was denied a fair trial by the prosecutor's improper remarks in her opening and closing arguments to the jury.

V.      Petitioner Woods was denied his right to due process and a fair and impartial trial by the trial judge's extensive questioning of a witness regarding his potential bias.

VI.     Petitioner Woods was deprived of his right to an impartial and fair trial when two (2) jurors failed to disclose their relationship, discussed the case outside the presence of other jurors, and decided petitioner's guilt on matters not in evidence.

### III.  Standard of Review

28 U.S.C. § 2254(d) imposes the following standard of review on federal courts

reviewing applications for a writ of habeas corpus:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).  Therefore, federal courts are bound by a state court's adjudication of a

petitioner's claims unless the state court's decision was contrary to or involved an unreasonable

application of clearly established federal law.  *Franklin v. Francis*, 144 F.3d 429 (6th Cir. 1998).

Additionally, this Court must presume the correctness of state court factual determinations.  28

U.S.C. § 2254(e)(1)[1]; *see also Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir. 1995) ("We

give complete deference to state court findings unless they are clearly erroneous").

The United States Supreme Court has explained the proper application of the "contrary

to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly
> established precedent if the state court applies a rule that contradicts the
> governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established
> precedent if the state court confronts a set of facts that are materially
> indistinguishable from a decision of this Court and nevertheless arrives at a result
> different from [the Court's] precedent.

*Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

With respect to the "unreasonable application" clause of § 2254(d)(1), the United States

Supreme Court held that a federal court should analyze a claim for habeas corpus relief under the

"unreasonable application" clause when "a state-court decision unreasonably applies the law of

this Court to the facts of a prisoner's case."  *Id.* at 409.  The Court defined "unreasonable

application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should
> ask whether the state court's application of clearly established federal law was
> objectively unreasonable. . .

---

[1]      28 U.S.C. § 2254(e)(1) provides, in pertinent part:

> In a proceeding instituted by an application for a writ of habeas
> corpus by a person in custody pursuant to the judgment of a State
> court, a determination of a factual issue made by a State court shall
> be presumed to be correct.

> [A]n unreasonable application of federal law is different from an incorrect
> application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application"
> clause, then, a federal habeas court may not issue the writ simply because that
> court concludes in its independent judgment that the relevant state-court decision
> applied clearly established federal law erroneously or incorrectly. Rather, that
> application must also be unreasonable.

*Id.* at 409-11.

## IV. Discussion

## A. Alleged Use of Perjured Testimony

Petitioner claims that he was denied his right to due process because perjured testimony was presented at trial and the Michigan Court of Appeals' decision holding that this testimony did not warrant a new trial was an unreasonable application of Supreme Court precedent.

"[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153 (1972) (internal quotation omitted). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). A conviction obtained by the knowing use of perjured testimony must be set aside "if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . .'" *Giglio*, 405 U.S. at 154 (*quoting Napue*, 360 U.S. at 271); *see also United States v. Agurs*, 427 U.S. 97, 103 (1976). In order to prove this claim, a petitioner must show that

> (1) the statement was actually false; (2) the statement was material; and (3) the
> prosecution knew it was false.

*Coe v. Bell,* 161 F.3d 320, 343 (6th Cir. 1999). Petitioner has the burden of proving a *Brady* violation. *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir.2000) (citing *Moore v. Illinois*, 408 U.S.

786, 794-95 (1972)).

In this case, Petitioner filed a motion for relief from judgment asserting that newly discovered evidence from one witness, Willie Thomas, and recanting testimony from another witness, Charles Kemp, undermined his convictions. The trial court conducted an evidentiary hearing regarding this newly-discovered evidence.

At trial, Charles Kemp testified that he was present at the shooting. Kemp, Tony Capers, and Cecil Brewington were at Tony's house on January 25, 1990, waiting for an individual named Syke. At approximately 6:00 p.m., someone knocked on the front door and, when asked, indicated his name was Syke. Capers opened the door and two men entered the room. Kemp identified Petitioner to be the man called Syke, and co-defendant Henderson to be the other individual. At one point, Petitioner went out to his vehicle. When Petitioner returned to the home, he had two additional men with him. One of the four men asked Cecil for his money; Kemp understood that Cecil had a large sum of money. Henderson pulled out a gun and told Kemp to lie face down on the floor. Kemp testified that Petitioner and the other two men also had handguns. Two of the four men took Capers to the back bedroom. Kemp heard three gunshots from the direction of the back bedroom. After hearing the shots, Kemp heard the other two men telling Brewington to open the door. Brewington could not open the door. Kemp heard some gunshots and Brewington screaming. The men then kicked out a window and exited the house that way. Kemp denied having any involvement in any drug sales orchestrated by Brewington.

At the evidentiary hearing, Kemp gave the following relevant testimony: He admitted that, in January 1990, he was selling drugs for Brewington. On the day of the shooting,

Petitioner and Henderson came to Capers' house when he, Brewington, and Capers were present. After a few minutes, two more men entered the home. Brewington and one of the two men began arguing and Brewington threw some money on the floor. Kemp testified that, at one point, Capers fled to the back bedroom. Capers was followed by one of the men, not Petitioner or Henderson. Seconds later, Kemp heard gunshots. He then dove to the floor and pulled out his gun. Petitioner and Henderson also dove to the floor. Kemp testified that neither Petitioner nor Henderson had a weapon. Seconds later, the Petitioner, Henderson and the other two men fled through a window. Kemp and Brewington left through the window and stood on the front porch. Willie Thomas approached the front porch. Brewington told Kemp and Thomas to go inside and clean up the money that was on the dining room floor, which they did. Kemp also went to the back bedroom and retrieved Capers' gun. He testified that when he gave a statement to police after the shooting he lied because Brewington was on an appeal bond and he was serving probation and he did not want either of them to get in trouble. Kemp decided to tell the truth about what had occurred in October 2001.

Willie Thomas, who did not testify at trial, testified at the evidentiary hearing. Thomas testified that on the day of the shooting, January 25, 1990, he was with Cecil Brewington and Charles Kemp at Tony Capers' house on Sparling Street. Brewington was involved in the drug business, although Brewington did not himself handle any of the drugs because he was released on bond pending an appeal. Thomas left the home before the shooting. When he returned to the home, Brewington and Kemp were on the front porch. They told Thomas that Capers had been shot. Brewington told Thomas to go inside the home and retrieve the money that was on the floor. He and Kemp did so. He also retrieved a 9 millimeter gun. Thomas then left the home.

He testified that he returned the money to Brewington the following day.

Also at the evidentiary hearing, the prosecution presented tape-recorded conversations between Kemp, who was incarcerated at the time, and several individuals. The prosecution argued that these conversations indicated that Kemp was receiving compensation for recanting his trial testimony from someone related to Petitioner. During one of the tape-recorded conversations, Kemp mentioned that he was coming to Detroit and that he had received $200 from "these dudes' cousin" on Cortland Street in Detroit, for which he was supposed to say they did not do anything. The prosecutor submitted evidence that petitioner received three money orders, including one for $200, prior to this taped conversation. The money orders listed Kemp's mother as the payer, however, the addresses listed on the money orders rendered that suspicious. One money order came from someone living on Cortland Street.

Following the evidentiary hearing, the trial court concluded that Kemp and Thomas committed perjury at trial, stating:

> I'm satisfied from more or less [what] I've read and heard that an injustice was done to both Defendants by perjury at the trial of this matter leading to their conviction. Their conviction and sentences is life in prison.
>
> That's evidenced by the testimony of Mr. Kemp and Mr. [Thomas]. . . . [T]his matter was tried through a jury. The jury believed Mr. Thomas and Mr. Kemp at that time, and they acted accordingly.
>
> I have substantial doubt at this point that Mr. Thomas and Mr. Kemp were truthful in their testimony to those jurors. Prejudice is obvious as each of them has been convicted and sentenced to life in prison.

Tr., 3/7/03 at pp. 36-37.

Petitioner's attorney then pointed out to the trial judge that Thomas did not testify at trial. The trial judge then clarified his holding as follows:

Thank you. I'm corrected. Mr. Kemp was and is believed by the Court and there's testimony here in the Evidentiary Hearing as you related to his and other person's here at the time of his domicile.

*Id.* at 37-38.

The prosecutor appealed the trial court's holding to the Michigan Court of Appeals. The

Michigan Court of Appeals reversed, stating, in pertinent part:

> The court failed to apply the good cause requirement in granting defendants' motions for judgment relief. The defendants did not raise this issue in their prior appeal because Charles Kemp had yet to recant his testimony and they apparently were not aware that Willie Thomas was present just before and after the shooting. Assuming that this is sufficient to meet the good cause requirement, the issue is whether defendants sufficiently demonstrated prejudice to warrant a new trial.

> For a new trial to be granted on the basis of newly discovered evidence, a defendant must demonstrate: (1) the evidence was newly discovered, (2) the newly discovered evidence was not cumulative, (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial, and (4) the new evidence makes a different result probable on retrial. *People v. Cress*, 468 Mich. 678, 692; 664 N.W.2d 174 (2003). However, when newly discovered evidence is in the form of a recanting witness who testified at the original trial, our courts have traditionally regarded this evidence as suspect and untrustworthy. *People v. Canter*, 197 Mich. App. 550, 559; 496 N.W.2d 336 (1992). In reviewing whether the trial court abused its discretion in deciding the motion for a new trial, this Court generally must defer to the trial court's superior opportunity to appraise the credibility of the witnesses. *Id.* at 560.

> The trial court failed to assess the substance of the new testimony and review the evidence from the trial to determine whether the testimony would probably have made a different result probable. A review of the trial testimony shows that the new testimony would not have changed the outcome of the trial, in light of the statements given by each defendant. Woods admitted that he shot Cecil Brewington, which was contrary to the testimony given by Kemp that Woods was not armed with a weapon and did not shoot anyone. Henderson's account directly contradicted Kemp's account that he arrived separately with Woods; instead, Henderson stated that Woods went inside the house first, came back, and then all four of them went inside the house. Although both witnesses also provided impeachment testimony with respect to Brewington, it was only related to a collateral point on Brewington's direct involvement in selling drugs and whether he knew Charles Kemp before the shooting. In addition, the tape-recorded phone conversations between Kemp and others prior to the motion hearing call his

credibility into question.  Because the new evidence would not affect the outcome of the trial, the court abused its discretion in granting the motions for relief from judgment.

*Woods*, slip op. at 1-2.

Petitioner argues that his rights under the Due Process Clause were violated when the State allowed Kemp's perjured testimony to go uncorrected.  Petitioner acknowledges that the prosecutor was unaware of the possibility that Kemp's testimony was perjured at trial.  However, he argues that, when the State learned that the testimony was perjured during the post-conviction evidentiary hearing, the State's failure to correct the error at that point violated Petitioner's rights under the Due Process Clause.  When Kemp gave his contradictory testimony at the evidentiary hearing, it was not clear that he had actually perjured himself at trial.  The prosecutor could have reasonably concluded that, in fact, the trial testimony was correct and the evidentiary hearing testimony perjured.  After the trial court ultimately issued its finding that Kemp perjured himself at trial, there was no need for the prosecutor to act to correct any error because the trial court granted a new trial.  Therefore, Petitioner's argument that his due process rights were violated by the prosecutor in this regard is meritless.

Petitioner also argues that the Michigan Court of Appeals' opinion was unreasonable because the newly discovered evidence warranted a new trial and the Court of Appeals' contrary conclusion was based upon its improperly substituting its credibility determinations for that of the trial court, failing to consider the entire record, failing to entirely weigh the relevant factors, and reaching conclusions that were contrary to the record.  Petitioner's argument that he was deprived of due process because the Michigan Court of Appeals failed to grant him a new trial on collateral review is not cognizable on habeas review because "the argument that an error was

made on post-conviction review does not challenge the constitutionality of the petitioner's custody." *Sitto v. Bock*, 2006 WL 2559765, *6 (E.D. Mich. Aug. 30, 2006).

Finally, Petitioner claims that this newly discovered evidence shows that he is actually innocent of the crimes. Although Petitioner argues that the Supreme Court has left open the question whether a free-standing actual innocence claim may form the basis for habeas corpus relief, the Sixth Circuit recently stated that it "continue[s] to adhere to the rule that a free-standing innocence claim is not cognizable for habeas review." *Sitto v. Lafler*, 279 F. App'x 381, 382 (6th Cir. 2008). Even if an actual innocence claim could stand alone to warrant federal habeas relief, the standard of review for such a claim would be "extraordinarily high." *House v. Bell*, 547 U.S. 519, 555 (2006), *citing Herrera v. Collins*, 506 U.S. 390, 400 (1993). Petitioner has not shown "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup v. Delo*, 513 U.S. 298, 327 (1995).

The Michigan Court of Appeals held that the trial court failed to assess the new testimony in light of all of the testimony given at trial or to determine whether, considered in that context, the new testimony may have impacted the outcome of the trial. The Court finds the Michigan Court of Appeals' conclusion in this regard reasonable. Although the court of appeals may have incorrectly stated some of the facts, the Court finds that the state court's opinion, nevertheless, is reasonable. While this Court must afford the state court's factual determinations deference, such deference does not require "abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). As pointed out by the Michigan Court of Appeals, the trial court's decision granting a new trial failed to consider how the new testimony impacted all of the evidence presented at trial. The trial court also was confused about exactly

14

which witnesses had testified at trial; initially finding that both Kemp and Thomas had perjured themselves at trial when Thomas never testified at trial.  The trial court also did not consider that recanting witnesses are generally viewed with "extreme suspicion."  *U.S. v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991). Kemp's recanting testimony is particularly suspicious considering the time that elapsed between his trial testimony and his recanting testimony and the suspicion that he may have received compensation for his testimony.

Additionally, Thomas's testimony does not undermine the Court's confidence in the jury's verdict.  Thomas waited seven years to come forth with any relevant information.  He testified that he did not notice that Brewington had been shot twice in the leg, while testimony was presented at trial that Brewington was bleeding heavily and grabbing at his leg in pain.

The Court finds that, considered in the context of the entire trial, the testimony given at the evidentiary hearing does not undermine the Court's confidence in the outcome of the trial. The state court's conclusion that the new evidence would not have affected the outcome of the trial was not unreasonable.

## B.  Sufficiency of the Evidence

Petitioner argues that the writ should be granted because insufficient evidence was presented at trial to sustain any of his convictions.

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court established that the standard of review for a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* at 319 (emphasis in original).  Pursuant to 28 U.S.C. § 2254(d)(1), this Court must determine whether

the state court's application of the *Jackson* standard was contrary to or an unreasonable application of Supreme Court precedent. In making this determination, this Court must afford the state court's findings of fact a presumption of correctness unless it is established by clear and convincing evidence that the factual determination in the state court was erroneous. 28 U.S.C. § 2254(e)(1); *West v. Seabold*, 73 F.3d 81, 83 (6th Cir. 1996), *cert. denied*, 116 S. Ct. 2569 (1996).

### 1. Felony Murder

Under Michigan law, the elements of felony murder are: (1) the killing of a human being; (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm would be the probable result; (3) while committing, attempting to commit, or assisting in the commission of any of the felonies enumerated in Mich. Comp. Laws § 750.316. *People v. Smith*, 478 Mich. 292, 318-319; 733 NW2d 351 (2007). To prove aiding and abetting of a crime, a prosecutor must show: (1) that the crime charged was committed by the defendant or some other person; (2) that the defendant performed acts or gave encouragement which assisted in the commission of the crime; and (3) that the defendant intended the commission of the crime or had knowledge of the other's intent at the time he gave the aid or encouragement. *People v. Moore*, 470 Mich. 56, 67; 679 NW2d 41 (2004). To be convicted of aiding and abetting felony murder, "[t]he requisite intent is that necessary to be convicted of the crime as a principal," that is, malice. *People v. Kelly*, 423 Mich. 261, 278; 378 NW2d 365 (1985). "[I]t therefore must be shown that the aider and abettor had the intent to kill, the intent to cause great bodily harm or wantonly and wilfully disregarded the likelihood of the natural tendency of his behavior to cause death or great bodily harm." *Id* "The facts and circumstances of the killing may give rise to an inference of malice. . . . A jury may

infer malice from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm." *People v. Carines,*460 Mich 750, 757, 597 N.W.2d 130, 135 (1999) (internal quotation omitted). Malice may also be inferred from the use of a deadly weapon. *Id.*

The Michigan Court of Appeals, the last state court to issue a reasoned opinion regarding this claim, held that sufficient evidence was presented to sustain the first-degree felony murder conviction, reasoning, in pertinent part:

> [T]he evidence was sufficient to support both a finding that Woods intended to aid and abet the underlying felony of attempted larceny and a finding of malice in order to prove felony murder. There was sufficient evidence of the underlying felony because the evidence shows that Woods arranged a drug transaction with Capers and participated in the attempted armed robbery with his three associates. In addition, there was sufficient evidence to support a finding of malice for first-degree felony murder. In *Flowers*, p. 178, this Court noted:
>
>> In situations involving the vicarious liability of cofelons, the individual liability of each felon must be shown. It is fundamentally unfair and in violation of basic principles of individual criminal culpability to hold one felon liable for an unforeseen death that did not result from actions agreed upon by the participants. If the homicide is not within the scope of the main purpose of the conspiracy, those not participating are not criminally liable.
>
> Here, the evidence indicates that defendant Woods was one of four armed men who acted together to commit an attempted robbery, and that one of those men used his weapon with the clear intent to kill Capers who was unarmed or to cause great bodily harm. Thus, a jury could infer from the presence of guns, and from their use, that Woods shared with his coparticipants in the attempted armed robbery a wanton and wilful disregard of the likelihood of death or great bodily harm resulting from the use of those guns in the course of the attempted robbery.

*Woods*, slip op. at 3.

Petitioner argues that the state court's holding is unreasonable because the state court incorrectly held that Petitioner could be convicted as an aider and abettor if it was shown that he participated in a crime "with knowledge of his principal's intent to kill." Petitioner argues that

the state court allowed the conviction to stand without a finding that Petitioner possessed the requisite malice.  In fact, the Michigan Court of Appeals held that the evidence supported a finding that Petitioner possessed a " wanton and wilful disregard of the likelihood of death or great bodily harm" from the use of guns in the course of the attempted armed robbery.  *Woods*, slip op. at 3.  Thus, the malice element of felony murder was established by Petitioner's wanton and wilful disregard of this risk.

Petitioner argues that such a conclusion is not supported by the evidence.  However, viewing all of the evidence in a light most favorable to the prosecution, as this Court must, the Court concludes that a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.  *Jackson*, 443 U.S. at 319

### 2.  Assault With Intent to Murder

Under Michigan law, assault with intent to murder is a specific intent crime that requires proof of the following elements: "(1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder."  *People v. Plummer*, 229 Mich. App. 293, 581 N.W.2d 753 (1998).

The Michigan Court of Appeals concluded that Petitioner had the intent to kill Brewington because Petitioner put a gun to his head.  Petitioner argues that the state court's holding was based upon an erroneous factual finding because, according to Petitioner, Brewington did not testify that Petitioner aimed the gun at his head.  Instead, according to Petitioner, Brewington testified that another, unidentified individual pointed the gun at his head.  Therefore, Petitioner concludes, insufficient evidence was presented to support a finding that he possessed the requisite intent.

In fact, the transcript of Brewington's testimony shows that the court of appeals' factual finding was not clearly erroneous. While Brewington identified someone other than Petitioner as having pointed the gun at his head, Brewington also testified that Petitioner, after twice shooting Brewington, started bringing the gun up towards Brewington's head. Vol. III, p. 300. Based upon this testimony, the Court concludes that a rational trier of fact could have found Petitioner guilty of assault with intent to murder.

### 3. Assault With Intent to Rob While Armed

Finally, Petitioner argues that insufficient evidence was presented to sustain his conviction for assault with intent to rob while armed because there was no evidence of his intent to rob or steal.

The last state court to issue a reasoned opinion regarding this claim, the Michigan Court of Appeals, held, in pertinent part:

> To establish the elements of this crime, the prosecutor must show (1) an assault; (2) a specific intent to rob or steal; and (3) that the perpetrator was armed. . . . As previously recounted, the evidence clearly demonstrates that Wood aided and abetted an attempted armed robbery. The assault began when the holdup was announced at gunpoint. The intent of the holdup was to rob and steal.

*Woods*, slip op. at 3.

Petitioner has failed to establish that the Michigan Court of Appeals' decision was contrary to or an unreasonable application of Supreme Court precedent. Viewing the facts in the light most favorable to the prosecution, Brewington testified that Petitioner had a gun, Petitioner's intent to rob could be inferred from his conduct and that of the others with whom he acted. This Court concludes that the Michigan Court of Appeals' decision that sufficient evidence was presented to sustain the conviction did not "result[] in a decision that . . . involved

an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Accordingly, Petitioner is not entitled to federal habeas corpus relief with respect to this claim.

## C. Ineffective Assistance of Counsel

Petitioner claims that his trial attorney was ineffective, thereby violating his rights under the Sixth Amendment. Specifically, Petitioner argues that his attorney was ineffective in: (i) failing to properly investigate and present a defense; (ii) failing to object to the prosecutor's improper statements; and (iii) failing to object to inadmissible hearsay.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-pronged test for determining whether a habeas petitioner has received ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient, which "requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Strickland*, 466 U.S. at 688; additional internal quotations omitted). However, when assessing counsel's performance, the reviewing court should afford counsel great deference. *Strickland*, 466 U.S. at 689 (observing that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time" and that a convicted person who seeks to criticize his attorney's performance "must

overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy'").

Second, a petitioner must show that counsel's deficient performance prejudiced petitioner. A petitioner may establish prejudice by "showing that counsel's errors were so serious as to deprive the defendant of a fair trial." *Id.*

## 1. Failure to Investigate and Prepare a Defense

Petitioner argues that his trial attorney failed to properly investigate and prepare a defense when he failed to discover that, at the time he testified for the prosecution, Cecil Brewington was released on an appeal bond from a conviction for possession of more than 50 but less than 225 grams of cocaine. During his testimony at Petitioner's trial, Brewington admitted that he provided $3,500 for a cocaine purchase and that he gave advice and counsel to others during the aborted drug deal. Petitioner argues the fact that Brewington was released on an appeal bond at the time of his testimony was relevant to his credibility and bias, and that the State showed favorable treatment toward Brewington by not seeking to have his appeal bond revoked after Brewington admitted his involvement in drug trafficking.

Respondent argues that this claim is procedurally defaulted because Petitioner failed to raise it in his appeal of right or on collateral review. Petitioner responds that his claim that counsel failed to investigate or present a defense was raised on direct appeal. While Petitioner presented a general claim that his attorney failed to investigate or prepare a defense on direct appeal, he did not do so on the ground that counsel failed to discover Brewington's criminal history or effectively cross-examine Brewington on that issue. Therefore, Petitioner has failed to exhaust this claim of ineffective assistance of counsel.

Where a petitioner "fails to present his claims to the state courts and . . . is barred from pursuing relief there, his petition should not be dismissed for lack of exhaustion because there are simply no remedies available for him to exhaust." *Hannah v. Conley*, 49 F.3d 1193, 1196 (6th Cir. 1995). No state court remedy is available to Petitioner because he already has filed a motion for relief from judgment in the state trial court and, pursuant to M.C.R. 6.502(G), may not file a successive motion. Where a petitioner fails to exhaust his state court remedies and the state court will no longer entertain his claims because of a procedural bar, the unexhausted claims are procedurally defaulted. *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001). A petitioner will not be allowed to present unexhausted claims unless he can show cause to excuse his failure to present the claims in the state courts and actual prejudice to his defense at trial or on appeal. *Hannah*, 49 F.3d at 1196.

Petitioner fails to allege cause to excuse his procedural default. Instead he argues that his actual innocence should excuse this default. Petitioner's unexhausted claim is procedurally defaulted unless he can establish that a constitutional error resulted in a fundamental miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851 (1995). The Supreme Court explicitly has tied the miscarriage of justice exception to procedural default to a petitioner's innocence. *Id.* at 321. Thus, Petitioner must assert a constitutional error along with a claim of innocence. "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Id.*. Petitioner has not supported his allegations of constitutional error with new reliable evidence of actual innocence that was not presented to the trial court. Accordingly, this claim is procedurally barred.

## 2. Failure to Object to Prosecutorial Misconduct

Next, Petitioner argues that his attorney was ineffective in failing to object to numerous instances of alleged prosecutorial misconduct. Petitioner alleges that his attorney should have objected to the prosecutor's: (i) denigrating defense counsel and the defense in her closing argument; (ii) arguing facts not in evidence; (iii) vouching for credibility of defense witnesses; and (iv) shifting the burden of proof.

To evaluate whether counsel was ineffective in failing to object to the prosecutor's conduct, the Court first considers the propriety of that conduct. The relevant inquiry in cases of alleged prosecutorial misconduct is "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, (1974)). The Court considers the following four factors to determine " whether the impropriety was flagrant:"

> (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong.

*Girts v. Yanai*, 501 F.3d 743, 758-59 (6th Cir. 2007) (internal quotations omitted).

First, Petitioner argues that the prosecutor denigrated the defense and defense counsel in her closing argument. The prosecutor argued to the jury that every time more than one person is involved in a crime, each individual argues he or she was merely present and did not actively participate in the crime. The prosecutor referred to this defense as the "three monkey defense," and invoked the phrase, "see no evil, hear no evil, speak no evil." Tr., Vol. V, pp 516-17. Petitioner argues these arguments were improper because they suggested that the defense was

trying to mislead the jury. Petitioner argues that the prosecutor also derided the defense and defense counsel when she argued that defense counsel was asking the jury to believe that Petitioner had a halo around his head. She also questioned Petitioner's defense that the charges against him were fabricated because Petitioner failed to ascribe a motive to any of the parties for fabricating a story. Finally, Petitioner also objects to the prosecutor's statement that Petitioner, who had to be extradited from Florida, had time to fabricate his defense.

The Court has reviewed the prosecutor's closing and rebuttal statements to provide context for the objected-to comments and finds that the prosecutor's comments were not improper. The prosecutor challenged Petitioner's defense using somewhat colorful language, but that does not render her comments improper. She questioned the believability of Petitioner's mere presence defense and pointed out that the extended time that elapsed between the crime and Petitioner's arrest could have provided Petitioner with the opportunity to fabricate a defense. The Court finds that none of her arguments rise to the level of prosecutorial misconduct.

Next, Petitioner argues that the prosecutor argued facts not in evidence when she argued that there was a completed larceny, that Petitioner had time to concoct a story, that no fingerprints were found at the scene of the crime because Petitioner was wearing gloves, and Petitioner failed to give a good description of the alleged perpetrator because criminals "don't snitch on each other." Tr., Vol. IV, at 587. The prosecutor did not argue that there was specific evidence that Petitioner concocted a story or that he was wearing gloves. She simply argued that these were reasonable inferences that could be drawn from the evidence presented. Additionally, the prosecutor's comments about the larceny and Petitioner's statement regarding the alleged perpetrator also posited reasonable inferences that could be drawn from the testimony presented.

Next, Petitioner argues that the prosecutor improperly vouched for the credibility of prosecution witnesses Cecil Brewington and Charles Kemp in her closing statement and that she injected her own opinion of the case into the opening statement. The Court finds that the prosecutor did not vouch for the credibility of prosecution witnesses in her closing statement. "'Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [prosecutor's office] behind that witness.'" *U.S. v. Trujillo*, 376 F.3d 593, 607 (6th Cir. 2004), *quoting U.S. v. Martinez*, 253 F.3d 251, 253-54 (6th Cir. 2001). The prosecutor did not place the prestige of her office behind Brewington or Kemp. Instead, she argued that the totality of the evidence presented supported their version of the events that transpired. The prosecutor specifically stated that certain physical evidence was corroborated by Brewington and Kemp's testimony. The prosecutor is free to argue that, based upon the evidence presented, certain testimony is more credible than other testimony. Additionally, the Court finds no support in the transcript for Petitioner's claim that the prosecutor improperly argued her opinion regarding the facts of the case in her opening statement.

Finally, Petitioner argues that the prosecutor improperly shifted the burden of proof to Petitioner in her closing statement when she argued that no evidence was presented to support Petitioner's defense. Prosecutorial comments on the validity of a defense theory do not shift the burden of proof to the defendant." *Traylor v. Price*, 239 Fed. App'x 235, 239 (6th Cir. 2007). The prosecutor's simply commented on the validity of Petitioner's defense and did not attempt to shift the burden of proof.

Because Petitioner has failed to show that the prosecutor engaged in misconduct, he

cannot show that his attorney was ineffective in failing to object to the conduct.

### 3. Failing to Object to Hearsay Testimony

Finally, Petitioner argues that counsel was ineffective in failing to object to testimony regarding statements purportedly made by the two unidentified gunmen involved in the shooting. Petitioner has not shown that these statements were inadmissible under Michigan law. Nor has he shown that counsel's failure to object to these statements deprived him of a fair trial. Therefore, he has not shown that his counsel was ineffective in this regard.

### D. Prosecutorial Misconduct

The Court addressed all of Petitioner's prosecutorial misconduct claims above, in the context of his ineffective assistance of counsel claims.

### E. Judicial Misconduct

Petitioner next argues that he was denied a fair trial when the trial court judge extensively questioned Charles Kemp about whether he was receiving any benefit in exchange for his testimony. Kemp, who was awaiting sentencing on an unrelated criminal conviction, repeatedly denied that he had been promised or was expecting any leniency in exchange for his testimony. Petitioner claims that the trial judge improperly and unnecessarily injected himself into the trial, evidencing a bias against Petitioner and that the questions served to improperly bolster the witness's credibility by suggesting he had no reason to testify falsely.

Respondent argues that this claim was not exhausted as a federal constitutional claim in state court. The requirement for exhaustion of remedies raises only federal-state comity concerns and is not a jurisdictional limitation on the power of the court. *Granberry v. Greer*, 481 U.S. 129, 131-36 (1987). An unexhausted claim may be addressed if the claim is without

merit, and addressing the claim would serve the interest of judicial efficiency and would not offend federal-state comity concerns. *Matthews v. Abramajtys*, 92 F. Supp. 2d 615, 628 (E.D. Mich. 2000). As discussed below, because the Court determines that the unexhausted claim lacks merit, the Court will address the claim in the interests of judicial efficiency and justice.

An impartial judge is a necessary component of a fair trial. *In re Murchison*, 349 U.S. 133, 136 (1955). This Court is guided by the standard established by the Supreme Court in *Liteky v. United States*, 510 U.S. 540 (1994), in addressing claims of judicial bias. In *Liteky*, the Supreme Court explained the measure of judicial conduct as follows:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

*Id.* at 554.

On habeas review the inquiry focuses on whether the trial judge's conduct rendered the trial fundamentally unfair. "To violate a defendant's right to a fair trial, a trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree." *McBee v. Grant*, 763 F.2d 811, 818 (6th Cir. 1985).

In this case, the trial court judge simply explored whether Kemp was testifying under any agreements, understandings, or beliefs which might impact the credibility of his testimony or be relevant to his motive for testifying. The Court finds nothing improper about the trial court's

inquiry.

## F.  Right to an Impartial Jury

Finally, Petitioner argues that he was denied his right to an impartial jury because two jurors, Edwin Brown and Bonita Wooden, failed to reveal during *voir dire* that they are related. This issue was raised on direct appeal and the state court of appeals remanded the matter to the trial court for an evidentiary hearing regarding the potential juror bias.

The trial court conducted a hearing at which both Brown and Wooden testified. Petitioner's trial attorney also testified.  Wooden testified that her stepbrother, Brown, served with her on Petitioner's jury.  She did not live with Brown at the time of the trial.  She saw him primarily on family occasions, such as Thanksgiving and Christmas.  She denied discussing the case with Brown outside the courtroom.  She testified that she did not reveal during *voir dire* that she and Brown were related because she was not asked that question.  She further testified that the verdict reached was hers and not her step-brother's.

Edwin Brown testified that Wooden was his step-sister.  He too testified that he did not reveal their relationship during *voir dire* because he was not asked whether he was related to any prospective jurors.  He testified that he and Wooden typically only saw each other on holidays. He further testified that his relationship with Wooden did not impact his ability to be fair and impartial, and that the verdict he reached was his and not Wooden's.

Defense counsel testified that if he had been made aware of the jurors' relationship and both jurors had said that they could be impartial, he doubted he would have used a peremptory challenge to excuse either one of them.

Following the evidentiary hearing, the trial court concluded that the evidence clearly

established the jurors were not asked whether they were related to each other and that neither of them, therefore, gave untruthful testimony during *voir dire*. The trial court held that Petitioner was not entitled to a new trial.

The Michigan Court of Appeals affirmed the trial court's conclusion, finding that "the evidentiary hearing produced no evidence of actual prejudice as a result of the nondisclosure." *Woods*, slip op. at 2.

The Sixth Amendment right to trial by jury encompasses the right to a fair trial by a panel of impartial jurors. *Irvin v. Dowd*, 366 U.S. 717 (1961). The right to due process, however, does not necessarily require a new trial in every instance in which a juror is potentially biased. *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Rather, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.* To establish entitlement to a new trial because of juror dishonesty during *voir dire*, a defendant "must first demonstrate that a juror failed to answer honestly a material question . . . and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). Only juror misconduct that deprives a defendant of a fair and impartial trial warrants habeas relief. *Clemmons v. Sowders*, 34 F.3d 352, 355 (6th Cir.1994).

Petitioner has not shown that Wooden or Brown gave any inaccurate responses during *voir dire*, or that their familial relationship evidenced a bias that would have compromised their ability to be impartial. As observed by the state court, none of their statements implicated their ability to fairly consider Petitioner's case. Thus, Petitioner has not shown that the state court's

conclusion was contrary to or an unreasonable application of Supreme Court precedent.

### V. Conclusion

For the foregoing reasons, **IT IS ORDERED** that the petition for a writ of habeas corpus

is **DENIED** and the matter is **DISMISSED WITH PREJUDICE**.


s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated:  October 23, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 23, 2008, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager